# United States Court of Appeals
## For the First Circuit

No. 15-2056

UNITED STATES OF AMERICA,

Appellee,

v.

PIERRE AZOR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Torruella, Selya, and Kayatta,
Circuit Judges.

Robert C. Andrews, for appellant.
Julia M. Lipez, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, and Margaret D.
McGaughey, Assistant United States Attorney, Appellate Chief, were
on brief, for appellee.

January 26, 2017

**TORRUELLA**, **Circuit Judge**.    Appellant Pierre Azor ("Appellant") appeals the district court's denials of his motions for suppression and severance, and claims that his sentence of thirty-six months of imprisonment is substantively unreasonable. After review, we find that the district court properly denied his motion to suppress and did not abuse its discretion in denying his motion to sever.    Additionally, Appellant's sentence is substantively reasonable.    Seeing no reason to vacate Appellant's conviction or sentence on the grounds that he has presented, we affirm.

## I. BACKGROUND

### A. Factual Background

#### 1. Intercepted Phone Calls

In March 2014, pursuant to a wiretap order authorized by the United States District Court for the District of Maine, United States Drug Enforcement Agency Task Force agents (the "Agents") intercepted phone calls and electronic communications in connection with a suspected drug trafficking conspiracy based out of Lewiston, Maine. See 18 U.S.C. §§ 2510-2522. From March 19 to March 21, 2014, Agents intercepted several phone conversations between Romelly Dastinot ("Dastinot") and an unidentified person known only as "Cash."   During these conversations, Dastinot and Cash discussed a plan in which Cash would take a bus to Boston,

Massachusetts, and purchase approximately one thousand "blues," which the Agents knew to mean thirty-milligram pills of Oxycodone. The pair planned to split the pills so that each had an inventory of five hundred to sell. Cash also commented that he could possibly sell "brown" (heroin) or "white stuff" (cocaine), but preferred dealing with Oxycodone.

On March 21, 2014, the Agents intercepted another call between Dastinot and Cash in which they discussed Cash's travel plans. Cash informed Dastinot that he would take the 1:50 p.m. bus from Lewiston to Boston, but would return instead to Portland, Maine, so that he would not appear at the Lewiston bus station twice in one day. In another call intercepted on the same day, the Agents heard Cash refuse to go to an apartment on Knox Street (in Lewiston) to collect money from Dastinot because Cash believed that the area was "too hot," and that possessing such a large amount of money would be suspicious and risky. Instead, the two confederates agreed that Dastinot, accompanied by an "elderly," would take Cash to the Lewiston bus station.

After hearing this conversation, the Agents contacted Maine State Police Trooper Tom Pappas ("Pappas"), who was assigned to the High Intensity Drug Trafficking Area program through the Drug Enforcement Agency. The Agents informed Pappas what they had heard over the wiretap and requested that he conduct surveillance

at the Lewiston bus station to watch for Cash. Pappas made his way to the top of a parking garage near the bus stop, where he could see the 1:50 p.m. Greyhound bus parked on the street. Pappas saw a red truck behind the bus that he recognized as belonging to Carrie Buntrock ("Buntrock"), a woman Pappas knew to be connected to Dastinot and whose age was in the early sixties. Pappas saw a man whom he did not recognize exit the vehicle and enter the Boston-bound bus. Pappas noticed that the man was wearing a blue jacket and black hat. Pappas watched as the bus departed the bus station without the man getting off of it.

Pappas relayed his observations to the Agents monitoring the wiretap, who informed him that the man who boarded the bus could be returning from Boston that same day with a load of drugs. Around 10:05 p.m. that same night, the Agents intercepted a call between Dastinot and Pierre Dubois ("Dubois"), a man who was primarily located in Boston. Dubois told Dastinot that he had dropped off a man at South Station, a bus and train terminal in Boston. The Agents informed Pappas of this call, and that the suspect could be on a bus destined for Portland. After reviewing the schedule to see when the bus from Boston was scheduled to arrive in Portland, Pappas drove to the Portland bus station to conduct surveillance. He observed a bus arrive at the station and, although he was not able to see the passengers disembarking

from the bus itself, he was able to see the passengers as they left the bus terminal. As he watched, Pappas saw the same man whom he had seen in Lewiston exit the bus terminal and get into a taxi. The man was wearing the same clothing that Pappas observed him wearing earlier that day.

Pappas followed the taxi as it drove from the bus station, onto I-295, and then northbound on I-95 towards Lewiston. Because Pappas was not wearing a uniform and was driving an unmarked cruiser, he asked Maine State Police Trooper Robert Cejka ("Cejka," or, collectively with Pappas and others, the "Officers"), who was in uniform and was driving a marked police cruiser, for assistance. Pappas had previously explained the developing situation to Cejka, and had asked him to remain stationed along the Maine Turnpike in case the man headed northbound from Portland towards Lewiston. As he followed the taxi, Pappas relayed the taxi's location to Cejka. Once the taxi passed the location where Cejka was parked, Cejka followed the vehicle for over ten miles, waiting for it to commit a traffic violation.

## 2. The Stop

Shortly after midnight on March 22, 2014, Cejka observed the taxi going 41 m.p.h. as it approached the Gray-New Gloucester toll booth, where the speed limit drops from 65 or 70 m.p.h. to 35

m.p.h. After the taxi drove through the toll booth, Cejka pulled the taxi over. By this time, Cejka was aware that Pappas had called Maine State Police Trooper Jerome Carr ("Carr"), a certified dog handler, to help with the investigation. Pappas had asked Carr to be ready to bring his drug-sniffing dog, Zarro, to help investigate the suspected drug smuggling. Cejka informed the driver that he had pulled the taxi over for exceeding the speed limit. After requesting and receiving a driver's license from the passenger, later identified as Appellant, Cejka discovered that the license had been suspended. Appellant, who acknowledged being aware of the license suspension, told Cejka that he had spent the night in Portland and was now going to Lewiston.

Carr arrived at the scene approximately twenty minutes later. Zarro sniffed intently along the car doors until he reached the passenger-side front door, where Appellant was seated. Zarro lifted himself up to the windowsill of the open passenger-side window, put his nose directly on Appellant's jacket sleeve, and then immediately sat down. According to both Carr and Cejka, drug dogs are trained to sit when they detect the presence of narcotics. Carr ordered the two occupants out of the taxi and asked Cejka to pat-frisk Appellant. The pat-frisk revealed a bus ticket showing that Appellant had gone from Boston to Portland only a few hours earlier. Appellant was not able to explain why he had lied about

-6-

his trip.  Zarro continued to search the vehicle, leading to Carr's discovery of a baseball-sized plastic bag underneath the passenger seat.  The bag was filled with 1,075 blue pills, later identified as Oxycodone.  Cejka arrested Appellant and booked him in the Cumberland County Jail, where Appellant confessed that the driver's license was not his, and that his real name was Pierre Azor.

### 3.  After the Stop

Two days later, while Appellant was no longer in custody, law enforcement intercepted another call between Cash -- whom they now identified as Appellant -- and Dastinot in which Appellant thanked Dastinot for "bailing him out," and told Dastinot that Appellant would repay him.  In another call on March 31, 2014, Appellant inquired whether Dastinot had "Molly," and the two discussed drug sales and prices for "the blues."  During the following month, Appellant and Dastinot continued to set up sales of drugs over the telephone, with Appellant often asking Dastinot for "blues."  On May 22, 2014, Agents executed an arrest warrant at Appellant's residence and seized drugs, a cell phone with the phone number matching Cash's, a heavily used scale, and approximately $4,000.

## B.  Procedural History

In a nine-count second superseding indictment, the government charged twelve defendants, including Appellant, Dastinot, Dmitry Gordon, and Buntrock, with crimes related to the distribution of drugs in Lewiston between early 2012 and May 2014. Appellant was charged only in Count Five of the second superseding indictment, for possession with intent to distribute a substance containing Oxycodone, and aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Count One charged Dastinot and four others with conspiracy to distribute and possess with intent to distribute mixtures containing heroin, cocaine base, and Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), 846.  Appellant was not named in this conspiracy charge.

Appellant filed a motion to suppress the evidence seized as a result of the stop and search of the taxi.  In addition, Appellant filed a motion to sever and for relief from prejudicial joinder.  After hearings, the district court denied both motions on March 23, 2015.  On April 17, 2015, Appellant pled guilty while reserving his right to appeal the denial of both motions. Appellant's presentence investigation report ("PSR") contained a guidelines sentencing range of forty-one to fifty-one months.  At the sentencing hearing, during which both Appellant and his girlfriend gave statements, the district court adopted the

-8-

guidelines range of the PSR, but concluded that a downward variance was warranted. The sentencing judge sentenced him to a term of imprisonment of thirty-six months, followed by thirty-six months of supervised release. The district court told Appellant that it considered his and his girlfriend's statements, the seriousness of the offense, his history and characteristics, and "the need to avoid . . . unwarranted disparities in sentencing between different defendants," and concluded that a downward variance was warranted. Judgment was entered on September 10, 2015. Appellant filed this timely appeal.

## II. ANALYSIS

### A. Motion to Suppress

In his suppression motion and at the subsequent hearing, Appellant argued that the stop in this case was pretextual, and that the police possessed neither reasonable suspicion nor probable cause to stop and search the taxi. Appellant reasoned that the information that the police obtained prior to the stop was insufficient to corroborate the information from the wiretap and other sources, and that the police needed additional evidence of Cash's identity before they could determine that the man that they saw getting on to the bus was the same person that was on the telephone calls. The district court found that the information obtained via the wiretap, along with the personal observations of

-9-

Pappas, amounted to probable cause to stop and search both Appellant and the taxi. Further, the district court found that the existence of probable cause to search was solidified by the information that the police obtained as a result of the stop, including the alert by the drug-sniffing dog.

On appeal, Appellant asks this court to find that the district court's conclusion that the Officers had probable cause to search the taxi was incorrect. Specifically, Appellant argues that, at the time of the search, law enforcement's observations were insufficient to corroborate the information gathered over the wiretap, and therefore did not establish probable cause to stop and search. The only corroboration that law enforcement had, according to Appellant, was Pappas's observations of a man getting out of a red truck belonging to someone who Pappas recognized as part of an investigation, boarding a bus in Lewiston, and later getting into a taxi in Portland that headed towards Lewiston. In Appellant's view, the information from the wiretap was left largely uncorroborated, and nothing about the information obtained by law enforcement allowed them to identify the man on the bus as Cash.

When reviewing the district court's ruling on a motion to suppress, we review its findings of fact for clear error and its legal conclusions de novo. United States v. Ponzo, 853 F.3d 558, 572 (1st Cir. 2017). Additionally, we review its application

-10-

of the law to the facts de novo.  United States v. Dent, 867 F.3d 37, 40 (1st Cir. 2017).  Appellant does not direct our attention to any facts that he believes are clearly erroneous, nor do we discern any after our review of the transcript.

A search of a vehicle does not violate the Fourth Amendment's protections against unreasonable search and seizure "if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained."  United States v. Ross, 456 U.S. 798, 809 (1982).  "Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts."  United States v. Martínez-Molina, 64 F.3d 719, 726 (1st Cir. 1995) (alteration omitted) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Police have probable cause to search "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  Ornelas v. United States, 517 U.S. 690, 696 (1996).

We apply the "collective knowledge" principle when reviewing the existence of probable cause.  That is, we look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer.  See Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1983) ("[W]here law

-11-

enforcement authorities <u>are cooperating in an investigation</u>, as here, the knowledge of one is presumed shared by all." (emphasis added)); <u>United States</u> v. <u>Fiasconaro</u>, 315 F.3d 28, 36 (1st Cir. 2002) (same). In the instant case, we agree with the district court that the collective knowledge of law enforcement officers involved in the investigation, viewed objectively, established probable cause to stop the taxi, search Appellant's person, and search the vehicle.

Armed with knowledge of the sex and likely race[1] of the suspect, the purpose of the trip, and a detailed and unique itinerary, law enforcement sought to corroborate this information. The intercepted phone calls revealed that Cash would be leaving Lewiston on a bus bound for Boston at approximately 1:50 p.m. Cash would return later that same night on a bus to Portland. Before going to the bus station in Lewiston, Cash would meet Dastinot, who would be accompanied by an "elderly," and would give Cash a ride to the bus station. At the bus station, Pappas witnessed Appellant, a black male, exit Buntrock's truck. Buntrock is a woman in her sixties[2] known to be associated with

---

[1] While not necessarily determinative of his race, Cash and Dastinot spoke to each other in Haitian Creole. It was thus reasonable for the Officers to infer that Cash was likely of Haitian descent.

[2] This Court makes no suggestion as to the age at which one may be considered "elderly." However, it was reasonable for the

Dastinot.  Pappas then witnessed the man get on to the Greyhound bus headed to Boston just prior to the 1:50 p.m. departure, and watched the bus depart without the man getting off.  This corroborated almost all of the information pertaining to Cash's departure.

Later that same night, around 10:05 p.m., the Agents intercepted another call between Dastinot and Dubois, who was located in Boston, during which Dubois told Dastinot that he took the man to South Station, corroborating the information gleaned from the wiretap that Cash would be returning the same night.  Given this information, Pappas reviewed the schedule of buses arriving in Portland from Boston that night and waited at the bus terminal.  Sure enough, Pappas witnessed the same man, wearing the same clothes, exit the Portland bus terminal soon after the bus from Boston was scheduled to arrive.  Appellant's presence in both of the exact places where Cash stated that he would be, especially in light of the nature of the intercepted itinerary, provided further corroboration that this man was indeed the same man as on the telephone.  The wiretap information was further corroborated when Pappas witnessed Appellant get into a taxi, and then followed

Officers to infer that, in this situation, Buntrock was the "elderly" to whom they heard Dastinot refer.

-13-

that taxi as it headed for Lewiston, a trip that even Appellant admits was unusual.

Appellant urges this Court to find that the district court was "too quick to find corroboration for purposes of probable cause," and that, "[w]hile it may have been possible to corroborate the information intercepted from the wiretap, [law enforcement] simply did not do the investigative work necessary." We are unpersuaded. Rather, as noted above, the record shows that law enforcement corroborated much of the information pertaining to Cash's identity and itinerary that it gathered from the wiretap. Given this level of corroboration, we find that law enforcement had probable cause to stop and search Appellant and any vehicle in which he was travelling.

Equally unavailing is Appellant's contention that the timing of the stop, and the behavior of the Officers, indicate that probable cause to search did not exist. Appellant contends that Pappas did not act as if he had probable cause when he did not detain Appellant at the Portland bus station, and did not instruct Cejka to detain Appellant. On a similar note, Appellant remarks that Cejka also did not act as if he had probable cause because he did not immediately arrest Appellant, but instead waited to arrest him until after Zarro arrived. Our case law makes clear that law enforcement is not required to arrest a suspect

immediately upon development of probable cause.  United States v. Winchenbach, 197 F.3d 548, 554 (1st Cir. 1999).  Rather, "when probable cause exists, the timing of an arrest is a matter that the Constitution almost invariably leaves to police discretion." Id.  The officer's decision to obtain additional information to bolster his probable cause determination after this legally justified stop does not negate the probable cause that already existed.  See id.  Pappas explained during the suppression hearing that he did not immediately stop the taxi because he was working in an unmarked capacity, and did not want to compromise the wiretap and ongoing investigation.  And, contrary to Appellant's assertion that Pappas did not instruct Cejka to detain Appellant, Cejka's testimony shows that Pappas did ask him to conduct a traffic stop of the taxi.  While the true purpose of the stop may have been to further investigate a suspected drug offense, the officer's reliance on a traffic offense to make the stop is irrelevant as there was plenty of cause to conclude that a crime was in process. See United States v. White, 804 F.3d 132, 138 (1st Cir. 2015) ("But, ultimately, neither the pretextual traffic stop nor the canine sniff search undermine the basic finding that, at the time that these events transpired, officers had adequate probable cause to stop [the defendant's] vehicle and to search it for evidence of drug dealing activity.").

As the stop and subsequent search of the taxi were both supported by probable cause, we affirm the district court's denial of Appellant's motion to suppress.

## B.  Joinder and Motion to Sever

Appellant's appeal of the district court's denial of his "motion to challenge joinder under Federal Rule of Criminal Procedure 8 and request for relief from prejudicial joinder under Federal Rule of Criminal Procedure 14" suffers the same fate.  As he did below, Appellant argues that: 1) the government did not have a basis to join him in a single indictment with the other defendants, and 2) he was "entitled to severance" based on the prejudicial spillover effect of the overwhelming evidence against the other defendants.  The district court concluded that Count Five was properly joined in a single indictment with Count One because the evidence linked Appellant to at least two other defendants, and that Appellant had not demonstrated that the prejudice he faced was likely to create a miscarriage of justice. We agree.

This Court reviews the joinder issue de novo and the denial of a motion to sever for an abuse of discretion.  Ponzo, 853 F.3d at 568.  The distinction is as follows: Rule 8 of the Federal Rules of Criminal Procedure governs joinder of offenses or defendants, and is primarily an issue of law warranting de novo

-16-

review; however, Rule 14, which governs relief from prejudicial joinder, involves the application of a guiding standard to a set of facts, rendering a higher degree of deference appropriate. United States v. Meléndez, 301 F.3d 27, 35 (1st Cir. 2002). We address each in turn.

### 1. Joinder

Rule 8(b) provides that

> The indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). The government can indict jointly based on "what it reasonably anticipates being able to prove against the defendants" at the time of indictment. United States v. Natanel, 938 F.2d 302, 306 (1st Cir. 1991). "In the ordinary case, a rational basis for joinder of multiple counts should be discernible from the face of the indictment." Id. Without a sufficient connection between the defendants charged with the crimes in an indictment, joinder is improper.

A strong preference exists for trying defendants together when defendants have been properly joined. Zafiro v. United States, 506 U.S. 534, 537 (1993). Joinder is warranted under Rule 8(b) "as long as there is some common activity binding

-17-

the objecting defendant with all the other indictees and that common activity encompasses all the charged offenses." Natanel, 938 F.2d at 307. The burden of persuasion in a claim of misjoinder rests with the defendant. Id. at 306; United States v. Luna, 585 F.2d 1, 4 (1st Cir. 1978). We will vacate a conviction only if we find both misjoinder and actual prejudice. Ponzo, 853 F.3d at 568.

Appellant asserts that the intercepted telephone calls do not reveal a connection between him and any of the other defendants besides Dastinot. We are mindful that "mere similarity of acts . . . cannot justify joinder." Natanel, 938 F.2d at 307. In order for joinder to be proper, there must be some common "mucilage" or activity between an objecting defendant and the other indictees, such as participation in a common drug distribution scheme. Id.; see also United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987). Joinder is proper, however, even when the objecting defendant is only connected to one part of that scheme. See Natanel, 938 F.2d at 307; see also Porter, 821 F.2d at 971.

Here, the Government correctly notes that the allegations of Appellant's drug dealings were not confined in the manner that Appellant contends. As described above, law enforcement had learned and corroborated information through intercepted telephone calls that Appellant was assisted during his

-18-

voyage to Boston by Dubois, who pled guilty to Count One. Further, Pappas witnessed Appellant getting out of co-defendant Buntrock's truck at the Lewiston bus station just prior to getting on the bus to Boston. In addition, during the intercepted telephone calls, Appellant and Dastinot discussed the drug sales of "Jimmy," a reference to co-defendant Dmitry Gordon. This evidence clearly establishes Appellant's connections to individuals other than Dastinot involved in this distribution conspiracy. While Appellant claims that he had no role in the conspiracy to distribute cocaine and heroin, the wiretap revealed Appellant speaking to Dastinot about the possibility of obtaining these drugs alleged in Count One, including "brown" (heroin) and "white stuff" (cocaine).

For support, Appellant points to the government's decision not to charge him in the conspiracy count, claiming that this highlights the lack of evidence to support joinder. But, the government's decision not to charge Appellant as a co-conspirator in Count One does not evidence misjoinder. While a conspiracy charge may provide the required link to render joinder proper, a particular defendant need not be charged with all crimes alleged in an indictment for the criminal matters to be properly joined. Natanel, 938 F.2d at 307; accord Pacelli v. United States, 588 F.2d 360, 367 (2d Cir. 1978) (holding that joinder is proper when evidence exists of conspiratorial activity, even if the conspiracy

-19-

is not charged in the indictment); United States v. Scott, 413 F.2d 932, 934-35 (7th Cir. 1969) ("[I]t is not necessary under Rule 8(b) that all the defendants need to be charged in the same count nor need the evidence [to] show that each defendant participated in the same act or transaction."). Given that the government alleged a sufficient connection between Appellant and several of the co-defendants, as well as between Appellant and the drugs charged in the conspiracy, we find that the district court correctly concluded that Appellant was properly joined.

### 2. Severance

Even when a case is properly joined, Rule 14 allows a court to sever counts or defendants for separate trials if that joinder would prejudice a defendant. Fed. R. Crim. P. 14. When joinder is proper, as it was here, a defendant must make a "'strong showing of prejudice' likely to result from a joint trial." Luna, 585 F.2d at 4 (quoting Sagansky v. United States, 358 F.2d 195, 199 (1st Cir. 1963)); see also United States v. Richardson, 515 F.3d 74, 81 (1st Cir. 2008) ("We must affirm the district court's denial of a motion to sever unless the defendant makes a strong, and convincing, showing of prejudice." (internal citations omitted)).

"Garden variety prejudice, however, will not, in and of itself, warrant severance." Richardson, 515 F.3d at 81. A

district court should only order severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. "Even where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others, we have been reluctant to secondguess severance denials." United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990). Our review is highly deferential, affording discretion to the trial court and only reversing for an abuse of that discretion. Luna, 585 F.2d at 4-5.

As we have long noted, some level of prejudice is inherent in trying two or more defendants together. King v. United States, 355 F.2d 700, 704 (1st Cir. 1966). But, where the evidence against a defendant might show a defendant's association with his co-defendants even if he were tried alone, the argument for prejudice becomes much weaker. Id. The "spillover effect," whereby evidence against co-defendants may inspire a "transference of guilt from one [defendant] to another," rarely constitutes sufficient prejudice to warrant severance. Kotteakos v. United States, 328 U.S. 750, 774 (1946). But see United States v. Baker, 98 F.3d 330, 335 (8th Cir. 1996) (finding the risk of prejudice of

-21-

a joint trial "too high" in light of an extremely serious and sensational crime).

As the district court acknowledged, there can be no doubt that here, given the number of defendants and charges, the risk of prejudice from the spillover effect clearly existed. However, this risk exists in every case involving co-defendants, and Appellant has failed to show that the district court abused its discretion in finding that this case lacked a heightened level of prejudice. It is up to a defendant to show "prejudice so pervasive that a miscarriage of justice looms." United States v. Trainor, 477 F.3d 24, 36 (1st Cir. 2007) (citation omitted). The district court found that adequate safeguards, such as clear limiting instructions to the jury, could successfully limit the spillover effect, and Appellant has failed to explain why these safeguards do not suffice. We discern no error in the district court's conclusion that Appellant has failed to make the required showing.

C. **Substantive Reasonableness**

Finally, we address Appellant's claim that the sentence imposed by the district court was substantively unreasonable. Appellant received a sentence of imprisonment for thirty-six months, below the guidelines sentencing range of forty-one to fifty-one months, but argues that this sentence was significantly longer than those of other co-defendants with similar criminal

records who served in the same role within the criminal enterprise. A reasonable sentence, which he argues would be eighteen months' imprisonment, would have rectified this disparity.

When sentencing a criminal defendant, the district court must consider a number of factors in order to "impose a sentence [that is] sufficient, but not greater than necessary . . . ." 18 U.S.C. § 3553(a). These considerations include, inter alia, the nature and circumstances of the crime, the history and characteristics of the defendant, the sentencing guidelines, and the need to avoid unwarranted sentencing disparities among similarly situated defendants. Id. Reasonableness "is not a static concept" as there exists a wide range of appropriately reasonable sentences. United States v. Ubiles-Rosario, 867 F.3d 277, 294 (1st Cir. 2017). As a sentence that falls within the guidelines range is presumed reasonable, Appellant faces an uphill battle to convince the Court that his below-guidelines sentence was substantively unreasonable. See United States v. Angiolillo, 864 F.3d 30, 35 (1st Cir. 2017) (citing Rita v. United States, 551 U.S. 338, 347 (2007)); see also United States v. Coombs, 857 F.3d 439, 452 (1st Cir. 2017).

When an objection to substantive reasonableness was not raised below, as in the case before us, our standard of review is unsettled. Coombs, 857 F.3d at 451. But, even under the more

-23-

favorable standard of review to Appellant -- review for an abuse of discretion, as opposed to plain error -- Appellant's claim fails. See id. A sentence is substantively reasonable if, couched in the § 3553 sentencing factors, it is supported by "a plausible sentencing rationale and a defensible result." United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008). Both the court's rationale and the result support the reasonableness of the district court's downwardly-variant sentence in this case.

The record reflects that the sentencing judge carefully and meticulously considered each of the sentencing factors in crafting the appropriate sentence for Appellant, with a particular emphasis on preventing unwarranted sentencing disparities. In concluding that the guidelines range called for a prison sentence greater than necessary, the court highlighted Appellant's age, family, abusive upbringing, lack of prior opportunity to obtain substance abuse treatment and vocational skills training, and behavior between arraignment and sentencing. These factors, the court concluded, suggested that, with the proper direction, Appellant is capable of being rehabilitated. Weighing against Appellant, as the court noted, was that his prior conviction, for which he served a two-year term of imprisonment, did not provide adequate incentive for him to change his behavior. The court found it quite compelling that Appellant returned to dealing drugs

for financial support upon release following his initial arrest in this case. Articulating its intention to impress upon Appellant that his behavior will no longer be tolerated, and to allow him to obtain educational, vocational, and other correctional treatment, the sentencing judge found the thirty-six month sentence to be sufficient but not greater than necessary. The rationale that an increasingly harsh sentence is appropriate to deter further misdoings, while leaving available the opportunity for rehabilitation, is clearly a plausible one. See Martin, 520 F.3d at 96.

Further, the district court's careful balancing of the sentencing factors surely achieved a defensible result. Not only did the district court's consideration of the sentencing factors result in a below-guidelines sentence, it also explicitly accounted for the avoidance of unwarranted disparities. While explaining the sentence to be imposed, the sentencing judge explicitly addressed Appellant's argument:

> I take very seriously the argument that was made with respect to avoiding unwarranted disparities with respect to sentence, particularly as pertains to other defendants that are part of the indictment to which Mr. Azor is subject in this case. And suffice it to say that I have given careful consideration to that and have of course sought to try and individualize the sentence in this case, taking into account among other things the prior conviction record and also the individual circumstances of each defendant.

While Appellant may not have liked the result of the court's balancing, "[t]hat it did not weigh the factors as the appellant would have liked does not undermine the plausibility of this rationale." Coombs, 857 F.3d at 452. The district court achieved a defensible and fair result well within the universe of reasonable sentences for Appellant.

## III. CONCLUSION

Finding no discernible error in the district court's denial of Appellant's motion to suppress and motion to sever, and finding Appellant's sentence to be substantively reasonable, the judgment and sentence of the district court are affirmed.

**Affirmed.**