# United States Court of Appeals
## For the First Circuit

No. 21-1813

UNITED STATES,

Appellee,

v.

MICHAEL BALSER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Kayatta, Lynch, and Thompson,
Circuit Judges.

Jaye L. Rancourt for appellant.
Anna Dronzek, Assistant United States Attorney, with whom
Jane E. Young, United States Attorney, and Seth Aframe, Assistant
United States Attorney, were on brief, for appellee.

June 16, 2023

**THOMPSON, Circuit Judge.** This case poses the question of whether and when a police officer, admittedly lacking his own probable cause, may seize and search a car at the direction of another officer. Enter Michael Balser. Following a suspected drug buy, Balser was pulled over by Salem, New Hampshire police officer Stephen DiChiara while driving up I-93, but only after a United States Drug Enforcement Agency (DEA) task force officer asked DiChiara to conduct the stop. DiChiara stopped and then seized the car, and a subsequent search of it uncovered roughly a kilogram of cocaine. From there, Balser was indicted for possession of cocaine with intent to distribute, so he moved to suppress evidence of the drugs, asserting that DiChiara could not act solely on the DEA officer's probable cause. After the district court denied the motion, Balser conditionally pled guilty, reserving his right to appeal the denial. This is that appeal. For the reasons stated below, we affirm.

## Background

When reviewing a district court's denial of a motion to suppress, "we take the facts from the judge's decision and from the hearing on the motion, presenting them in the light most compatible with [her] ruling." United States v. McGregor, 650 F.3d 813, 816 (1st Cir. 2011).

Before getting to Balser's stop, we first offer a bit of context on the federal drug investigation that precipitated it.

- 2 -

In 2017, the DEA began investigating a drug trafficking organization (DTO) headquartered in Lawrence, Massachusetts that it believed to be selling large quantities of heroin, fentanyl, and cocaine. As part of that DEA investigation, Salem, New Hampshire police officer Nicholas Turner was assigned to work as a task force officer, where he got versed in the ins-and-outs of the DTO's business. This is some of what he learned. Typically, a buyer would text the DTO's dispatch phone number and place their drug-of-choice order, and the DTO would direct the buyer to pick up their purchase somewhere in Lawrence (the location would occasionally change). The buyer would let the DTO know when they were 20 or 30 minutes away from the meet-up spot.

After about two years into the investigation, the DEA team determined that its probe had "exhaust[ed]" -- they'd only been able to arrest lower-level DTO members who wouldn't give up any information and picking off those low-level members only caused the DTO to change its dispatch number to avoid detection. Turner explained that the DTO's dispatch number changed often -- seven to ten times after he joined the investigation -- and each time the dispatch number changed, the team would need to procure the new number from a confidential source to further its investigation. So, to enhance its monitoring of illegal drug activity and make inroads into nabbing DTO hierarchy, the team sought, and in late

February 2019 a federal judge granted, a 30-day Title III wiretap of the DTO's electronic communications (i.e., text messages and call logs to and from the dispatch number).[1]

*Balser's Drug Buy*

As part of his role in the investigation, Turner reviewed wire intercepts between the DTO and its customers. Some 15 days in to the first wiretap surveil, the known dispatch phone number went dead, so the DEA team had to track down a new number from a confidential source, which it confirmed by making a controlled purchase on that number. Then on March 14, 2019, a judge approved a second wire intercept of the new dispatch number, but after doing so, there was a short transmission delay; it took the cell provider about a day to begin providing messages from the new number to the task force. This got remedied on March 15, when Turner, working from the Bedford, New Hampshire wire room (just across the state line from Lawrence), received a "flood" of messages from that day and the day before.

Around 2:00 PM on the 15th, Turner began clearing the deck of the prior day's messages when he noticed a conversation

---

[1] Often used in drug trafficking investigations, a so-called Title III wire refers to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, a Congress-created means for law enforcement to surveil electronic communications, among other media, if approved by a federal judge and certain other conditions are met. See United States v. Cartagena, 593 F.3d 104, 108 n.1 (1st Cir. 2010).

between the DTO and a new player, Balser (whose phone number was identified by the cell provider).  The back-and-forth from the 14th went like this:

> **DTO:** Are you still coming tomorrow?
> **Balser:** Yup.
> **DTO:** Okay, [no problem], my friend . . . See you tomorrow.
> **Balser:** Usual plus sample.
> **DTO:** [No problem], I'll add a ball of good soft on your order.
> **Balser:** For me, period, [thank you].  The sample is brown, right?
> **DTO:** One ball of brown and one ball of good soft.[2]

Turner understood these messages to mean that Balser was placing an order with the DTO to purchase drugs on March 15 (i.e., that day).  Reviewing next the intercepts from earlier on the 15th, Turner saw a message from the DTO to Balser, asking him to let the DTO know when he was 30 minutes away from the pickup spot.  Around 2:30 PM, Turner, after getting caught up with all the old messages, saw Balser's reply come in live.  Balser informed the DTO that he was now 30 minutes away and heading toward 525 Essex St. in Lawrence, as directed.  That location was familiar to Turner since the DEA team had conducted surveillance, made controlled

---

[2] Turner explained that the DTO would provide samples for their usual customers to grow their business.  And some terminology for those curious -- according to Turner, "good soft" generally means powder cocaine; "brown" is often heroin, but sometimes fentanyl.

purchases, and carried out some arrests there. By that point, DEA agents were in Lawrence ready to surveil the pickup spot.

Balser then texted the DTO that he had arrived, the DTO instructed him to enter the front door of the building and head up to the fourth floor, and Balser texted back that he had made it into the building. Seeing the texts, Turner radioed to the DEA agents (already on the ground near Essex St.) that the DTO had directed Balser there. He instructed them to close in on 525 Essex St., as the messages suggested that Balser had just entered. Agents responding to Turner's directive reported back that a white Hyundai Sonata -- with Vermont plates registered to Balser -- had parked nearby. Agents had also observed Balser exit the Sonata and enter 525 Essex St. with a backpack, then return to the car about five minutes later and drive off. The agents then followed Balser as he drove away from Essex St. to I-93 North, and maintaining their contact with Turner, told Turner to request that a marked, uniformed police officer be dispatched to stop Balser's car on the highway.

*The Stop, Seizure, and Search*

That's when Turner reached out to DiChiara, a Salem police officer working a daytime patrol shift, to request that he intercept Balser's car. DiChiara was no stranger to Turner or the DEA investigation. The two had worked together as police officers in Salem, Turner had previously called up DiChiara when the DEA

team needed a uniformed officer to stop a car on I-93, and the two had at some point discussed the wiretap and the ongoing investigation. Turner testified that he told DiChiara that there was a Title III wiretap as part of an ongoing drug investigation, that the car had been in Lawrence to complete a drug transaction, that the car was now driving north on I-93 toward Vermont, and that there were suspected drugs inside.[3] Turner asked DiChiara to smoke out a traffic violation to justify stopping Balser, and to develop his own probable cause to seize and search the car that was separate from the DEA's. Turner explained that this type of stop is called a walled-off or whisper stop, where local law enforcement conducts a stop (or search) based upon their own reasonable suspicion (or probable cause) to keep the broader investigation under wraps.

---

[3] Turner's testimony about what information he shared with DiChiara over the phone conflicts with DiChiara's testimony: DiChiara testified that he was only told to look for a white sedan with Vermont plates, but that Turner did not direct him to make the stop, nor did Turner convey any information about the drug investigation or Balser's drug transaction that day. The district court credited Turner's testimony and found DiChiara's testimony not credible based in part on inconsistencies in the various police reports DiChiara filed after the incident. We usually apply the "highly deferential" clear error standard to a district court's "credibility calls," letting them "stand unless we are left with a definite and firm conviction that the judge made a mistake." McGregor, 650 F.3d at 820. Here, however, Balser has not raised any argument that the district court clearly erred in crediting Turner's testimony over DiChiara's. By failing to raise any credibility argument in his brief, Balser has waived it. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015).

After speaking with Turner, DiChiara was monitoring traffic on I-93 when he spotted Balser's car drive by. As per Turner's directive, he pulled Balser over for, as he puts it, "traveling too close" to the car in front of him and for having an obscured license plate. During the stop, DiChiara attempted to develop his own probable cause to apprehend and search Balser's vehicle. According to DiChiara, he concluded he had probable cause to seize the car based upon several factors: (1) Balser's indirect route from Massachusetts, where he claimed to be visiting his mother, back home to Vermont, (2) Balser's apparent nervousness (overly so) for a simple traffic stop, (3) Balser's cellphone ringing during the stop and Balser not answering it, and (4) a small piece of cotton on the driver's side rear floorboard, which DiChiara said was "indicative of narcotics use."[4] Believing he had probable cause, DiChiara seized Balser's car, and had it towed to the Salem police station, where a drug-sniffing dog (K9 Dash) was deployed on the outside of the car. Dash alerted to the presence of drugs in Balser's car, and with that positive identification added to the reasonable-suspicion mix, DiChiara applied for and received a warrant in New Hampshire state court to search Balser's vehicle. In it, he found a kilogram of cocaine.

---

[4] The government concedes that DiChiara lacked independent probable cause, so we need not interrogate DiChiara's stated justifications.

*District Court Proceedings*

On November 13, 2019, a federal grand jury sitting in the District of New Hampshire indicted Balser on a single count of possession with intent to distribute cocaine. See 21 U.S.C. § 841(a)(1). Balser moved to suppress the drugs found during the search of his car. In support, he argued that DiChiara lacked reasonable suspicion for the traffic stop in the first place and lacked probable cause to seize and search his car. In response, the government invoked the collective knowledge doctrine (more to come on that concept), asserting that the DEA's or Turner's probable cause could be imputed to DiChiara when Turner directed him to stop Balser's car. After a multi-day evidentiary hearing -- where both Turner and DiChiara testified -- the district court denied Balser's motion to suppress. Following that ruling, Balser entered a conditional guilty plea, preserving his right to appeal the denial of his motion to suppress. See Fed. R. Crim P. 11(a)(2). The court sentenced Balser to time served with three years of supervised release. And here we are.

## Discussion

When reviewing a district court's denial of a motion to suppress, we review its legal rulings de novo and factual findings for clear error, "and we must uphold a denial of a suppression motion if any reasonable view of the record supports it." United States v. Gonsalves, 859 F.3d 95, 103 (1st Cir. 2017). Balser

- 9 -

brings appellate challenges of both the factual-error and legal-error varieties, which we'll now take in turn.

*Factual Errors*

Balser asserts that the district court made two factual errors, which he says, "change the [legal] analysis of the suppression issue" (to erroneous, we gather). He focuses on two factual findings, but neither surpasses the high clear error bar. See United States v. Siciliano, 578 F.3d 61, 67–68 (1st Cir. 2009) ("To find clear error, an inquiring federal court must form a strong, unyielding belief, based on the whole of the record, that a mistake has been made.").

First, and somewhat confusingly, Balser claims that the district court "possibly overlooked" the fact that Turner reviewed the March 14 messages on March 15 after the wire went back up, such that "[t]here was very little time" for Turner and the DEA agents to exchange information about Balser. We gather that Balser argues (again without full explanation) that given the short time frame, the district court clearly erred by finding that Turner did share information with on-the-ground DEA agents (and vice versa) that Balser was headed to 525 Essex St. in Lawrence to complete his drug transaction. Even assuming the district court overlooked the fact that Turner quickly reviewed the March 14 messages on the next day, it supportably found that Turner and the DEA agents exchanged information about Balser in real time on the 15th.

Turner testified that he instructed the agents over the radio to "position themselves near 525 Essex St." and explained to them that Balser had placed an order with the DTO, and was heading toward 525 Essex St., as directed by the DTO. Turner and the agents stayed in communication as Balser approached and entered that address. From there, the agents radioed back to Turner that they had seen Balser get out of his car with a backpack, head in to 525 Essex St., exit about five minutes later to get back in his car, and drive off. We therefore find no clear error where the record supports the court's finding that Turner and the DEA agents indeed shared this information.

Second, Balser asserts that the district court's findings overstated the information that Turner shared with DiChiara over the phone when Turner directed DiChiara to stop Balser, specifically the "observations in Lawrence" and "the extent or content of the wire communications." Though he doesn't spell it out, we presume what Balser means by "observations in Lawrence" are the on-the-ground agents' observations of Balser leaving his car, entering 525 Essex St. with a backpack, returning to his car, and driving off. Similarly unexplained, we presume what he is referring to as the "extent or content of the wire communications" is the substance of the texts Balser exchanged with the DTO. But contrary to Balser's assertions, the district court did not find that Turner shared any such "observations" or

the content of Balser's communications picked up by the wire. Instead, it found that "Turner told DiChiara that the car had been in Lawrence where the driver had likely completed a drug transaction, that the car was headed north on Interstate 93, and that Turner believed there were drugs inside the car[,]" and that (emphasis ours), "Turner did not reference Balser's text messages specifically, but he told DiChiara that this information was based on a wiretap from an ongoing DEA investigation." Turner's testimony, which the district court credited, supports the court's factfinding.

Finding no clear error on either front, we reject Balser's argument that errors in the district court's factfinding infected its probable cause analysis.

*Collective Knowledge*

Balser contends that the district court erroneously attributed Turner's probable cause to DiChiara to justify the stop, seizure, and search of his car, since there's no dispute, he says, that DiChiara failed to develop his own probable cause for any of what transpired. Specifically, Balser challenges the district court's application of the collective knowledge doctrine to the facts here. Before assessing Balser's arguments for reversal, we briefly walk through some background legal principles.

Usually, police must "obtain a warrant before conducting a search [or seizure]," as the Fourth Amendment requires.

- 12 -

_Gonsalves_, 859 F.3d at 103. But that general rule has several exceptions, including the automobile exception. Id. The exception applies when, as here, "a moving vehicle susceptible of transporting contraband is lawfully stopped by the police on a public highway." United States v. Simpkins, 978 F.3d 1, 6 n.1 (1st Cir. 2020). With that exception in play, all the police need to search or seize a car is "probable cause to believe that contraband is within the particular vehicle." Id. at 6; see United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (same). And police have probable cause "when the totality of the circumstances suggests that 'there is a fair probability that contraband or evidence of a crime will be found in [the particular vehicle].'" United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013) (quoting United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009)). While "reviewing the existence of probable cause . . . we look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017). This is the so-called collective knowledge doctrine.

Two of our sister circuits and several state courts have helpfully labeled two categories where the collective knowledge doctrine may apply: vertical and horizontal. See, e.g., United States v. Massenburg, 654 F.3d 480, 493 (4th Cir. 2011); United

- 13 -

States v. Chavez, 534 F.3d 1338, 1345-46 (10th Cir. 2008); Commonwealth v. Privette, 204 N.E.3d 967, 975-76 (Mass. 2023). Vertical collective knowledge cases look like this: "[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge." United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997) (emphasis ours); Massenburg, 654 F.3d at 493 (explaining that courts "simply . . . substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer"). Predictably, horizontal cases function differently. There, courts pool or "aggregate information available to . . . all the officers involved in the investigation." United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) (emphasis ours) (citing Meade, 110 F.3d at 193-94). In other words, "a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." Chavez, 534 F.3d at 1345. The two categories, however, are "by no means mutually exclusive," for "the officer who has probable cause [in a vertical case] may possess that information as a result of communication from other officers." See id. at 1345 n.12.

Our prior cases have considered both scenarios without using the same bifurcated nomenclature, but we've noted the

distinction between directing another officer to make an arrest (a so-called vertical case) and pooling or aggregating information between multiple officers to create probable cause (a horizontal case).[5]  See Meade, 110 F.3d at 194.  And here, Balser's core legal argument for reversal goes all in on us finding that this is a horizontal case.  Before proceeding, we note that both parties and the district court used the same collective-knowledge lexicon, and so, we follow suit and employ them too, with the caveat that the two categories are not always cut and dry.  See Chavez, 534 F.3d at 1345 n.12.

With the basics of these two categories out of the way, we move on to explain a key difference in their application.  As the Massachusetts Supreme Judicial Court recently explained after extensively surveying state and federal cases applying various permutations of the collective knowledge doctrine, "[r]eliance upon vertical collective knowledge has sparked little controversy . . .[,]" while, on the other hand, "[f]ederal and [s]tate courts

---

[5] Our cases have not resisted these directional labels, and a survey of out-of-circuit cases reveals no resistance either.  Other courts appear to simply distinguish their cases, like we have, more substantively.  See, e.g., United States v. Williams, 627 F.3d 247, 253 (7th Cir. 2010) (applying collective knowledge doctrine where "DEA agents asked local law enforcement officers to stop a specifically-identified vehicle, and the local officers had no knowledge of the facts underlying the DEA's probable cause" (emphasis ours)); United States v. Sandoval-Venegas, 292 F.3d 1101, 1105 (9th Cir. 2002) (applying collective knowledge doctrine where "pooled knowledge" of officers involved in investigation amounted to probable cause for arrest).

are split over how broadly to apply the horizontal outgrowth of the collective knowledge doctrine." Privette, 204 N.E.3d at 975-78; see, e.g., Massenburg, 654 F.3d at 494 (declining to expand horizontal collective knowledge doctrine to permit after-the-fact aggregation where on-scene officers did not share underlying facts justifying reasonable suspicion with each other). Our own case law has yet to squarely address the "maximum reach" of the so-called horizontal collective knowledge doctrine (i.e., aggregation of information among multiple officers), United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (citing United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) (finding reasonable suspicion where unconveyed information was aggregated from different officers on the scene carrying out a stop, but also expressing concern with courts more broadly pooling information to justify searches)), although we have repeatedly permitted the aggregation of information among multiple officers involved in an investigation to find probable cause and uphold searches and seizures, see, e.g., United States v. Verdugo, 617 F.3d 565, 573 (1st Cir. 2010); United States v. Pardue, 385 F.3d 101, 107 (1st Cir. 2004); Cook, 277 F.3d at 86.

Jumping on what he sees as a split of authority, and a dearth in our case law, Balser urges us to classify his case as being part and parcel of the more controversial horizontal

variety.[6]  He argues that Turner possessed some but not all the information sufficient to support probable cause (though he fails to specify in his brief what information Turner lacked), thus needing to "pool[]" the information "relayed to him by multiple members of the DEA task force," which prompted him to request that DiChiara make the stop.  And because this is a horizontal case, Balser says, Turner was required to share more of the underlying facts about the investigation with DiChiara, beyond the basic tidbits conveyed (that Turner believed Balser was driving up I-93 with drugs in his car).  Since Turner shared insufficient facts about the investigation here (and because DiChiara failed to develop independent probable cause of his own), the argument goes, there was no probable cause for the stop, seizure, or search.

We disagree with the basic premise of Balser's contention, which cuts our inquiry off at the start.  Like the district court, we conclude that Balser's case is best viewed as vertical, not horizontal, after homing in on the interaction

---

[6] Balser also argues briefly that the two seminal Supreme Court cases establishing the collective knowledge doctrine did not "clearly articulate approval of" it.  We reject that argument out-of-hand, as our longstanding precedent has applied the doctrine based on these two cases.  See, e.g., United States v. Ferreira, 821 F.2d 1, 5 (1st Cir. 1987) (citing Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971) and United States v. Hensley, 469 U.S. 221, 232 (1985) to uphold arrest where knowledge of one officer was imputed to another based on directive to make an arrest); United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021) (citing Hensley for the same).

- 17 -

between Turner and DiChiara -- crucially, a fully clued-in Turner directed DiChiara to stop Balser.

By the time Turner called DiChiara to request the stop, he (Turner) knew all the facts supporting his own probable cause to believe that Balser had purchased drugs from the DTO and was driving up I-93 with those drugs in his car. Turner had personally reviewed all the wire intercepts from March 14 and 15 showing that Balser had placed an order with the DTO, that he was heading to 525 Essex St. for the transaction, and that he arrived and entered the building. While DEA agents were on the ground to observe Balser exit his car with backpack in hand to pick up the drugs, then re-enter and drive off toward I-93 North, they communicated these facts in real time to Turner in the wire room, so for our probable cause inquiry, Turner possessed these facts, even if indirectly. See Williams, 627 F.3d at 255 (explaining that it's not relevant whether a directing officer learns information firsthand or from other officers involved in the same investigation, so long as that information amounts to probable cause and leads to a sufficient directive to the arresting officer); Chavez, 534 F.3d at 1347 (determining a case was "vertical" where "the aspects of [a] DEA investigation that [were] pertinent to the probable cause inquiry were known to" the directing DEA officer, such that the directing officer "had all the requisite probable cause components"). With all that

information in tow, Turner had probable cause to believe Balser possessed drugs in his car.

Turner then called up DiChiara and directed him to stop the suspect vehicle. In so doing, he explained that the DEA was up on a wire, that an individual (Balser) had ordered drugs and completed his purchase, and that he then left the Lawrence, Massachusetts area headed up I-93 North with drugs in his car. Turner's directive to stop Balser was thus sufficient to attribute Turner's probable cause to DiChiara. See Meade, 110 F.3d at 197 (imputing directing officer's probable cause to arresting officer after directive was given over radio to "locate the brown car and arrest 'the third man'" involved in attempted robbery); United States v. Paradis, 802 F.2d 553, 556-57 (1st Cir. 1986) (upholding arrest ordered by superior, where DEA had probable cause but arresting officer "admittedly lacked probable cause"); United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007) (holding that officer's directive that arrestee be body searched was enough to impute the directing officer's personal knowledge to the searching officer). And we think the extent of the directive itself (as we described above) was sufficient, too. Other courts to have considered analogous factual circumstances have affirmed the imputation of probable cause with similarly basic information shared between the directing and arresting officers. See United States v. Celio, 945 F.2d 180, 183-84 (7th Cir. 1991) (holding

- 19 -

that state police had probable cause to stop and search a car based solely upon DEA sharing "the location and direction of a specific vehicle and its suspected contents" but not the "intricate details of its surveillance"); see also Chavez, 534 F.3d at 1347 (collecting cases from the Third, Fifth, Seventh, Eighth, and Ninth Circuits holding that in vertical cases, "a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause").[7]

Given our conclusion that Turner's directive to DiChiara was sufficient to impute Turner's probable cause to DiChiara, we decline Balser's invitation to address both the outer limit of horizontal collective knowledge cases and the quantum of information that must be shared between officers in horizontal cases, since this is not such a case. And Balser makes no argument in the alternative that, should we find his case to be a vertical

_____

[7] Because we conclude that Turner adequately directed DiChiara to apprehend Balser's car, we reject Balser's argument that the collective knowledge doctrine cannot apply here because DiChiara had no affiliation with the DEA investigation. Balser's argument goes to horizontal cases. But there is no reliance here on the aggregation of different pieces of information known by Turner and DiChiara. Rather, DiChiara acted at Turner's direction, so by virtue of the directive, there was "necessarily a communication between those officers, and they are necessarily functioning as a team." United States v. Ramirez, 473 F.3d 1026, 1036, 1037 n.8 (9th Cir. 2007) (cleaned up).

one, as we have, he could still win.  Accordingly, we spy no legal error in the district court's denial of Balser's motion to suppress.

## Conclusion

For these reasons, we <u>affirm</u>.