# United States Court of Appeals
## For the First Circuit

No. 14-2165

UNITED STATES OF AMERICA,

Appellee,

v.

ADAM WHITE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Kayatta, Stahl, and Barron,
Circuit Judges.

Timothy E. Zerillo and Hallett, Zerillo & Whipple, P.A. on brief for appellant.
Margaret D. McGaughey, Assistant United States Attorney, and Thomas E. Delahanty II, United States Attorney, on brief for appellee.

October 20, 2015

**STAHL**, **Circuit Judge**.  Defendant-Appellant Adam White was arrested after his vehicle was stopped and searched by officers with the Maine Drug Enforcement Agency ("MDEA"), the Maine State Police, and the Portland Police Department ("PPD").  The search of White's car involved the use of a drug-sniffing dog, named Aros, and resulted in the discovery of cocaine and a firearm.  White entered a conditional guilty plea on charges of possession with intent to distribute cocaine and possession of a firearm in furtherance of a drug trafficking crime.

On appeal, White now contends that the district court erred by: (1) denying his motion for discovery of records and other information relating to Aros's prior performance in real-world sniff searches; and (2) denying his motion to suppress.  Because we agree with the district court that the search of White's vehicle was supported by probable cause, we AFFIRM the denial of the motion to suppress.  For reasons described more fully below, we need not consider the issues raised by the motion for discovery.

## I. Facts & Background

In August 2012, a confidential informant ("CI") reported to MDEA Special Agent Seth Page ("Page") that White was a large-scale cocaine distributor in the Portland, Maine area, and that the CI had purchased cocaine from White "many times" in the past.  This information prompted Page to begin an investigation.  Working with Page, the CI completed two controlled purchases of cocaine

- 2 -

from White. The first took place in August 2012, and the second took place several months later in December 2012. In both instances, White drove to a prearranged location where he met the CI, and the controlled purchase took place inside White's vehicle.

In early February 2013, the CI reported to Page that White was planning to "restock" his cocaine supply. This led Page to devise a scheme to stop and search White's vehicle. Page met with the CI on February 12, 2013, and at Page's instruction, the CI placed a call to White and ordered a "full" ounce of cocaine. In a recorded telephone conversation, White assured the CI that he would be leaving "pretty soon," and that he would "definitely bring [the full] out with me." Prior to this recorded call, the CI had told Page that he believed White had restocked his supply of cocaine.

Previously, Page had placed White's home in Falmouth, Maine under surveillance. Approximately ten minutes after the call from the CI, MDEA agents stationed at White's home reported that White and his girlfriend were leaving the premises in his black Cadillac.[1]

In addition to placing White's home under surveillance, Page had also arranged with a Maine State Police Trooper, Adam Fillebrown, and a PPD Officer, Mark Keller, to be on standby.

---

[1] This was the same vehicle White had used in the second controlled purchase.

Trooper Fillebrown was placed on standby with Aros, his drug-sniffing canine partner.

As White left his home, he was followed in unmarked cruisers by several MDEA agents, including Agents Jake Hall and Andrew Haggerty. Agent Hall observed as White drove down Auburn Street in Portland, and visually estimated that White was travelling at twenty to twenty-five miles per hour in a fifteen-mile-per-hour school zone. Agent Hall relayed this information to Agent Haggerty, who then passed it on to PPD Officer Keller.

Officer Keller, who was in a marked PPD cruiser, stopped White's vehicle on Stevens Avenue. Although Officer Keller had been briefed on the investigation and the reasons for the traffic stop, he informed White only that he had been pulled over for speeding in a school zone. As Officer Keller initiated the traffic stop, Trooper Fillebrown was summoned to the scene, where he arrived some seven minutes later. As Fillebrown arrived, Officer Keller told White that Fillebrown was training a new drug-sniffing dog, and that the dog was going to conduct a sniff search of White's vehicle as a training exercise.[2]

Trooper Fillebrown led Aros on a series of passes around White's vehicle. On the fourth pass by the driver's side door,

---

[2] This was of course untrue, though the government notes that Officer Keller perhaps needed to lie to White in order to protect the identity of the CI.

Aros alerted that he had located the scent of narcotics. Once Aros had alerted, Officer Keller asked White and his girlfriend to exit the vehicle. He conducted a pat-down and search of White's pockets, where he found three one-ounce baggies of cocaine. Officer Keller then placed White under arrest. As he did so, Trooper Fillebrown conducted a search of the vehicle, where he discovered a gun in the driver's side door and approximately one pound of cocaine in a sealed package in the trunk.[3]

After the traffic stop, Page completed a search warrant application for White's home in Falmouth. The warrant application was approved that day, and MDEA agents promptly began their search, locating some 3,300 grams of cocaine, several bags of marijuana, a handgun, cash, and assorted drug paraphernalia. White was indicted on one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).

During discovery, White requested that the government provide him with information about the Maine State Police's use of drug-sniffing dogs. Specifically, he asked for training and certification records for Trooper Fillebrown and Aros. He also

---

[3] Officers also discovered two cellphones. Pursuant to a warrant, Page later searched the phones and discovered text messages discussing drug sales and deposits of sale proceeds.

asked for records and video recordings of previous sniff searches that Aros had conducted in the field, as well as training and certification records for a drug-sniffing dog named Caro, with whom Trooper Fillebrown had worked prior to Caro's retirement.

The government produced the training and certification records for Trooper Fillebrown and Aros, but refused to turn over information about Aros's prior sniff searches or Caro's training. The government took the position that the records of Aros's prior sniff searches contained sensitive information about ongoing investigations, and that the records of Caro's training were simply not relevant.

White filed a motion for discovery seeking to compel the government to disclose this evidence. He maintained that the information he sought was crucial to proving that Aros's sniff search was defective, and that officers therefore lacked probable cause to search his vehicle. In support of his motion, White submitted the affidavit of a canine expert, who opined that Aros's behavior during the traffic stop - particularly his need for multiple passes around the vehicle - was indicative of inadequate training and improper handler "cueing."

Pursuant to a report and recommendation issued by a magistrate judge, the district court denied White's motion for discovery. The district court reasoned that, pursuant to a then-recent Supreme Court decision, Florida v. Harris, __ U.S. __, 133

- 6 -

S. Ct. 1050 (2013), the government was under no obligation to disclose the information regarding either Aros's prior searches or Caro's training.

Later, White filed a motion to suppress. In relevant part, he argued that Officer Keller did not have probable cause to stop his vehicle, and that Aros's alert did not provide probable cause to search his car. Therefore, he argued, the evidence in the car and at his home had been obtained illegally as fruit of the poisonous tree.[4]

Following a two-day hearing, the district court denied White's motion to suppress. In his oral decision, the district court found that the stop and search of White's vehicle were permissible under the automobile exception to the Fourth Amendment warrant requirement. The district court reasoned that the officers had probable cause, solely on the basis of information provided by the CI and Page's investigation, to believe that White's car would contain evidence of drug dealing activity at the time it was stopped. Based on this finding, the district court declined to separately consider whether Aros's sniff search independently provided probable cause to initiate a search.

---

[4] White's motion also sought to suppress incriminating statements made at the time of his arrest. For example, after he had been handcuffed, White stated to Officer Keller, "this isn't a regular traffic stop, is it?"

After the denial of his motion to suppress, White entered a guilty plea, conditioned on his right to seek appellate relief. See Fed. R. Crim. P. 11(a)(2). The district court sentenced White to a prison term of seventy months on the cocaine possession and distribution count, and a consecutive term of sixty months on the firearm count. This appeal followed.

## II. Discussion

We begin by considering the district court's denial of White's motion to suppress, which we review by means of a two-tiered inquiry. United States v. Ford, 548 F.3d 1, 3 (1st Cir. 2008). We review the district court's factual findings for clear error, and we review its legal conclusions de novo. Id. A finding of fact will amount to clear error "only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Mousli, 511 F.3d 7, 11 (1st Cir. 2007) (quoting United States v. Ferreras, 192 F.3d 5, 9-10 (1st Cir. 1999)). "So long as any reasonable view of the evidence supports the decision, the district court's ruling will be upheld." United States v. McLellan, 792 F.3d 200, 212 (1st Cir. 2015).

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures in the absence of a warrant supported by probable cause. U.S. Const. amend. IV. Under the automobile exception, however, "police officers may seize and

search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014); see also Florida v. White, 526 U.S. 559, 563-64 (1999) ("[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.").

"Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'" Silva, 742 F.3d at 7 (quoting Robinson v. Cook, 706 F.3d 25, 32 (1st Cir. 2013)); see also Harris, 133 S. Ct. at 1055 ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." (citations omitted) (internal quotations marks and alterations omitted)). "The test for probable cause is not reducible to 'precise definition or quantification.'" Harris, 133 S. Ct. at 1055 (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)). Rather, "[t]he standard is satisfied when the totality of the circumstances create 'a fair probability that . . . evidence of a crime will be found in a particular place.'" Silva, 742 F.3d at 7 (quoting United States

v. <u>Hicks</u>, 575 F.3d 130, 136 (1st Cir. 2009)).  All that is required is the kind of "fair probability on which reasonable and prudent people, not legal technicians, act."  <u>Harris</u>, 133 S. Ct. at 1055 (quoting <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 231, 238 (1983) (internal quotation marks and alterations omitted)).

Where, as here, "the primary basis for a probable cause determination is information provided by a confidential informant, law enforcement must provide some information from which a court can credit the informant's credibility." <u>United States</u> v. <u>Ramírez-Rivera</u>, __ F.3d __, 2015 U.S. App. LEXIS 15081, at *45 (1st Cir. Aug. 26, 2015) (citations omitted) (internal quotation marks and alterations omitted).  In other words, "a probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." <u>United States</u> v. <u>Greenburg</u>, 410 F.3d 63, 69 (1st Cir. 2005).  The First Circuit has identified a "non-exhaustive" list of factors to examine in deciding on an informant's reliability: (1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information.  <u>Ramírez-Rivera</u>, 2015 U.S. App. LEXIS at

*45-46 (citing <u>United States</u> v. <u>Tiem Trinh</u>, 665 F.3d 1, 10 (1st Cir. 2011)).

The district court found that the warrantless search and seizure of White's vehicle were justified by the automobile exception. The district court reasoned that the information gleaned from the CI and Page's subsequent investigation gave officers adequate probable cause to believe that White's car would contain evidence of drug dealing activity at the time of the traffic stop. The record soundly supports these conclusions.

The investigation in this case began when the CI provided information to Page that White was a large-scale cocaine distributor in the Portland area.[5] In his disclosures to Page, the CI evinced a significant basis for first-hand knowledge regarding White's activities. He reported, for example, that he had purchased cocaine from White "many times" in the past, and that White most frequently sold drugs from his vehicle. The CI also provided Page with White's home address.

Subsequently, Page was able to corroborate much of the information that the CI provided. For example, Page testified that he was able to confirm White's home address by cross-checking the information provided by the CI with a registry of motor

---

[5] Page testified that the CI cooperated in the hope of receiving favorable treatment with respect to drug charges pending against him at the time.

vehicles database. Page also testified that, in addition to assisting in the White investigation, the CI provided information in another case that was later corroborated and used to further that investigation.

Most significantly, Page corroborated the CI's tip that White sold drugs primarily from his vehicle. Page worked with the CI to execute two controlled purchases from White, the first taking place in August 2012, and the second taking place in December 2012. In both instances, the CI placed a call to White, requested a quantity of cocaine, and arranged a time and place to meet. Again, in both instances, White arrived in his car, the CI entered the car and completed the purchase, then exited. During the second purchase, White drove the same black Cadillac he would later be using at the time of his arrest.

Page testified that, in early February 2013, the CI informed him that White was planning to "restock" his cocaine supply. This prompted Page to devise the operation that eventually resulted in the stop of White's vehicle. On February 12, Page met with the CI and directed him to call White and to order a "full" ounce of cocaine. In a recorded call, the CI placed the order, and White assured him that he would be leaving his house "pretty soon," and would "definitely bring [the full] out with me." Some ten minutes later, agents stationed at White's home observed him

leaving in his Cadillac.  Prior to the recorded call, the CI told Page that he believed White had restocked his supply of cocaine.

Viewing these facts and circumstances in their totality, as we must, Silva, 742 F.3d at 7, we conclude that, at the time of the traffic stop, officers had ample reason to believe that White was en route to conduct a sale of cocaine, and that a search of his vehicle would yield evidence of drug dealing activity. Therefore, pursuant to the automobile exception, officers had probable cause to stop and search White's vehicle, including the passenger compartment and the trunk.  See United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011) ("[The automobile exception] provides that '[i]f there is probable cause to believe a vehicle contains evidence of criminal activity,' agents can search without a warrant 'any area of the vehicle in which the evidence [might] be found.'") (quoting Arizona v. Gant, 556 U.S 332, 347 (2009)).

In theory, then, this might have been a straight-forward probable cause case.  In practice, it was anything but.  Rather than rely on the automobile exception and the probable cause they already had, Page and his fellow officers decided to use a pretextual speeding infraction to stop White's car and to conduct a canine sniff search (under false pretenses) in an effort to gain

- 13 -

even more probable cause.[6]  While we recognize that law enforcement officers routinely face difficult questions about the adequacy of probable cause, there can be no doubt that these decisions rendered this investigation and the ensuing criminal prosecution unnecessarily complicated.[7]

But, ultimately, neither the pretextual traffic stop nor the canine sniff search undermine the basic finding that, at the time that these events transpired, officers had adequate probable cause to stop White's vehicle and to search it for evidence of drug dealing activity.  Under these circumstances, the automobile exception and the Fourth Amendment require nothing more.

### III. Conclusion

We need say nothing more, and thus decline to separately consider the issues raised by the district court's denial of White's motion for discovery.  See PDK Labs. Inc. v. United States Drug Enforcement Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[I]f it is not necessary to decide more, it is necessary not to

---

[6] Asked why he opted to conduct the sniff search, Page testified before the district court that he was "looking for something extra . . . just to add to what we already had."

[7] To illustrate the point, the use of a canine sniff search led directly to a protracted discovery dispute involving extensive briefing and dueling expert witnesses.  Then, issues related to the sniff search occupied the majority of the district court's two-day-long suppression hearing.

decide more . . . ."). In that motion, White sought information he thought he might be able to use to prove that Aros's sniff search was inadequate to give officers probable cause to search his vehicle. However, because we find that the stop and search of White's vehicle were independently justified on the basis of the automobile exception, the probable cause determination as it relates to the canine sniff search becomes a matter of idle curiosity. The district court's denial of White's motion to suppress is AFFIRMED.