# United States Court of Appeals
## For the First Circuit

No. 19-1948

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT SIMPKINS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Torruella, Selya, and Thompson,
Circuit Judges.

Sarah A. Churchill and Nichols & Churchill, P.A. on brief for appellant.
Halsey B. Frank, United States Attorney, and Julia M. Lipez, Assistant United States Attorney, on brief for appellee.

October 15, 2020

**SELYA**, **Circuit Judge**.  When gauging the validity of a motor vehicle search under the so-called automobile exception to the warrant requirement of the Fourth Amendment, see U.S. Const. amend. IV, probable cause furnishes the beacon by which courts must steer.  In this appeal, defendant-appellant Robert Simpkins asseverates that the district court misfigured the probable cause equation.  Concluding, as we do, that this asseveration is groundless and that the defendant's other claims of error are equally futile, we affirm the judgment below.

## I. BACKGROUND

We rehearse the facts as supportably found by the district court following an evidentiary hearing on the defendant's motion to suppress both physical evidence and statements made at the scene of a traffic stop.  When necessary, we flesh out these findings with uncontested facts drawn from the record.  See United States v. Dancy, 640 F.3d 455, 458 (1st Cir. 2011).

On March 21, 2018, a traffic stop conducted by the Maine State Police netted a driver in possession of a large quantity of oxycodone pills and Suboxone strips.  That driver, whom we shall call "CD," subsequently became a cooperating defendant.  He told the troopers that he had bought the contraband from "Rob," an individual who lived in Rhode Island.  Text messages between CD and Rob, disclosed to the troopers, discussed prices and quantities of "pinks," "green ones," and "strips."  CD added to the troopers'

store of knowledge by furnishing a cellphone number for Rob, a description of Rob's house and car, and an insight that while CD usually traveled to Rob to buy drugs, Rob sometimes traveled to Maine.

Working with the federal Drug Enforcement Administration (DEA), the Maine State Police discovered that the cellphone number supplied by CD belonged to defendant-appellant Robert Simpkins. A photograph of the defendant was obtained from the Rhode Island Department of Motor Vehicles and shown to CD, who confirmed that the individual depicted was the man who had been selling drugs to him. Further research confirmed that the defendant's residence and vehicle matched the descriptions provided by CD.

In April of 2018, CD began working with law enforcement officers to orchestrate a meeting with the defendant in Maine. On April 4, CD called the defendant and told him that he was unable to make a planned trip to Rhode Island and asked that the defendant advise him about any sojourns he might be taking to Maine. This call was recorded and, after some further (unmonitored) communications between the two men, the defendant agreed that he would come to Maine on April 28.

When April 28 dawned, surveillance of the defendant commenced outside his Rhode Island home. A DEA task force member observed the defendant load several items into his car, including a box that he placed in the trunk. Between loads, the defendant

locked his car and kept a wary eye on his surroundings.  Before the defendant left for Maine, CD called him and asked for a final price.  The defendant responded by texting that he was "[h]eading out about 2" and was looking for "3850 if it ain't short."

Once his car was loaded, the defendant drove to a nearby parking lot, exited his vehicle, and entered another vehicle.  The second vehicle drove a short distance before doubling back and returning the defendant to his own car.  The defendant then started his drive to Maine, followed surreptitiously by members of the task force.

Shortly after crossing the border into Maine, the defendant's vehicle was intercepted by the Maine State Police.  Because they were aware that the defendant owned a number of firearms, the troopers followed their procedures for high-risk arrests:  they removed the defendant from his car at gunpoint, ordered him to the ground, and handcuffed him.  Asked if he had "anything on" him, the defendant stated that he had only a pocketknife.  Palpating another item while conducting a pat-down of the handcuffed defendant, the trooper asked:  "What's that?"  The defendant replied that the bulge was "[j]ust a little bit of fentanyl."

Next, a drug-sniffing dog explored the inside and outside of the defendant's vehicle.  The dog, trained to detect several types of narcotics but not oxycodone or Suboxone, did not

alert.  Nevertheless, a search of the defendant's vehicle disclosed an envelope containing Suboxone strips in the passenger compartment and thereafter a box containing an electrical device called a ballast in the trunk.  Concealed behind a panel on the ballast was a smell-resistant "Stink Sack" holding quantities of oxycodone and other illicit substances.

While the vehicle search was underway, a state trooper spoke with the defendant in a police cruiser.  After reading the defendant his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), the trooper told him that he had been detained as part of a federal investigation into drug-trafficking and urged his cooperation.  The defendant admitted to possessing the fentanyl found in his pocket, and he later admitted to possessing the Suboxone found in his car.  He nonetheless disclaimed any involvement in drug-trafficking.  Then — upon seeing a trooper open the ballast — he blurted out that "[s]he found it all."  At that point, the defendant was arrested.

In due season, a federal grand jury sitting in the District of Maine returned a superseding indictment charging the defendant with conspiracy to distribute and possess with intent to distribute oxycodone, see 21 U.S.C. §§ 841(a)(1), 846, and possession with intent to distribute oxycodone, see id. § 841(a)(1).  The defendant maintained his innocence and moved to suppress both the physical evidence found during the search of his

vehicle and the statements he had made at the scene.  In support, he argued that the authorities lacked probable cause to search his car and that his statements were obtained in derogation of his Miranda rights.

After an evidentiary hearing and plethoric briefing, the district court denied the defendant's motion to suppress.  See United States v. Simpkins, No. 2:18-cr-115, 2019 WL 148650, at *1 (D. Me. Jan. 9, 2019).  In the aftermath of that ruling, the defendant entered a conditional guilty plea to count 2 (possession with intent to distribute oxycodone), preserving his right to appeal the denial of his motion to suppress.  On September 10, 2019, the district court dismissed count 1 of the indictment on the government's motion and sentenced the defendant to a twenty-four-month term of immurement on count 2.  This timely appeal followed.

## II. ANALYSIS

Our analysis proceeds in two main parts.  First, we examine the defendant's contention that the authorities lacked probable cause to search his vehicle.  Second, we examine his Miranda-based claims.  We subdivide this latter examination into distinct segments, focusing separately on statements made before and after the provision of Miranda warnings.

Our standard of review is familiar.  We appraise the district court's denial of the motion to suppress through a

bifurcated lens, accepting the court's findings of fact unless clearly erroneous but subjecting its legal conclusions to de novo review.  See United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  In the absence of legal error, "we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record."  United States v. Arthur, 764 F.3d 92, 96 (1st Cir. 2014) (quoting United States v. Lee, 317 F.3d 26, 29-30 (1st Cir. 2003)).

## A.  **The Vehicle Search.**

When the so-called "automobile exception" applies — and this is such a case — a warrantless search of an automobile may proceed so long as the authorities have probable cause to believe that contraband is within the particular vehicle.[1]  See California v. Acevedo, 500 U.S. 565, 580 (1991); United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014).  A finding of probable cause does not demand proof beyond a reasonable doubt but, rather, may be made

---

[1] The "automobile exception" recognizes that the "ready mobility" of motor vehicles makes strict adherence to the Fourth Amendment's warrant requirement practically impossible.  Collins v. Virginia, 138 S. Ct. 1663, 1669 (2018) (quoting California v. Carney, 471 U.S. 386, 390 (1985)).  As relevant here, the exception applies when a moving vehicle susceptible of transporting contraband is lawfully stopped by the police on a public highway.  See, e.g., Carroll v. United States, 267 U.S. 132, 149 (1925).  If at that point the police have probable cause to believe that the vehicle contains evidence of criminal activity, they may search the vehicle without first obtaining a warrant.  See United States v. White, 804 F.3d 132, 136 (1st Cir. 2015).

"when the totality of the circumstances create 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Almonte-Báez, 857 F.3d 27, 31-32 (1st Cir. 2017) (quoting United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015)). Intelligence supplied by an informant may support a finding of probable cause when "the probability of a lying or inaccurate informer has been sufficiently reduced." United States v. Gifford, 727 F.3d 92, 99 (1st Cir. 2013) (quoting United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005)).

In order to assist in assessing the credibility of an informant, we previously have set forth a non-exhaustive compendium of potentially relevant factors. See United States v. White, 804 F.3d 132, 137 (1st Cir. 2015). These include:

> (1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information.

Id. Viewing the record as a whole, we have little difficulty in concluding that the authorities had probable cause to search the defendant's vehicle.

CD's information furnished a coherent tale: the defendant was not only the source of the oxycodone and Suboxone

that was found in CD's possession but also was an ongoing supplier. Crucially, CD's account was based upon first-hand knowledge — knowledge that CD substantiated by referring the troopers to a series of text messages to and from the defendant. The district court found that experienced officers reasonably believed that the "pinks," "greens," and "strips" that CD discussed with the defendant referred to illicit substances. Simpkins, 2019 WL 148650, at *1 & n.2; see United States v. Dunston, 851 F.3d 91, 96-97 (1st Cir. 2017) (explaining that law enforcement officers with experience in drug-trafficking investigations may interpret jargon used in that trade); see also United States v. Tiem Trinh, 665 F.3d 1, 12-13 (1st Cir. 2011) (noting that court may credit the "particular knowledge and experience" of officers in reviewing probable cause determinations). Moreover, in an exchange that occurred on the day before CD was found in possession of Suboxone strips that he professed to have purchased from the defendant, the pair discussed "how many strips" the defendant had available for sale and whether adverse weather conditions would affect the ability of the two men to meet and "get it over with."

This evidence, compelling in itself, was bolstered by what transpired after CD began to cooperate with the authorities: CD contacted the defendant on several occasions, including two telephone calls aimed at arranging another meeting. These two calls not only prompted the defendant to make what amounted to a

sales trip to Maine but also corroborated CD's self-described relationship with the defendant. In the first call, CD told the defendant that he "need[ed] to get something" but was unable to travel to Rhode Island. The defendant responded that he had stored "those" in his mother's safe because he was not comfortable keeping "them" in his own house — references that the troopers reasonably understood to be references to illicit substances.

To cinch the matter, on the day of the defendant's planned journey to Maine, CD requested that the defendant "send [him] a price for a total." This was followed by a text message from the defendant, which read: "Heading out about 2 . . . 3850 if it ain't short."

No more was exigible. At the time the defendant left for Maine, the authorities had abundant evidence supporting CD's claims to first-hand knowledge of the defendant's drug-trafficking activities. So, too, they had solid reason to believe that the defendant would be transporting to Maine illicit substances for delivery to a prospective customer (CD). And, finally, the defendant's behavior before leaving Rhode Island, witnessed at first hand by task force members, was consistent with the drug-trafficking scenario. Cf. Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to

- 10 -

particular types of noncriminal acts."). It was, therefore, objectively reasonable for the authorities to believe that the defendant would have contraband in his vehicle when he arrived in Maine.

Although this tableau is redolent of probable cause, the defendant strives to snatch victory from the jaws of defeat. As an initial matter, he challenges CD's reliability and veracity in three ways: he adverts to CD's felony record, the fact that CD may have lied to the authorities, and CD's assertion — not borne out at the time of the traffic stop — that the defendant transported contraband in the door panels of his vehicle.

We do not gainsay that all of these points are potentially relevant and often may be factored into the probable cause calculus. For instance, the fact that an informant has a felony record belongs in the mix when analyzing the informant's reliability. See United States v. Brown, 500 F.3d 48, 55 (1st Cir. 2007). But probable cause determinations are typically made on the basis of the totality of the evidence, see Almonte-Báez, 857 F.3d at 31, and a felony record does not preclude a finding of probable cause where, as here, the informant's story "reasonably appears to be reliable," Brown, 500 F.3d at 55. And in all events, CD was "known to the police . . . [and] could have been held accountable if [the] information proved inaccurate or false." Id. at 54.

The defendant's second point seems to refer to CD's statement, when initially stopped by the police, that he had been at a Connecticut casino. This statement, even if false — a matter on which the record is opaque — preceded both the discovery of contraband in CD's possession and CD's decision to cooperate with the authorities. Given the substantiated information that CD later provided, a meaningless fib about where he had been would do little to skew the probable cause calculus in the defendant's favor.

Finally, the fact that oxycodone was found in the trunk of the defendant's car, rather than in the door panels, is simply irrelevant. Although CD told the authorities that the defendant used the door panels to conceal drugs, there is nothing in the record indicating either that the authorities placed any particular weight on that statement or that CD at any time represented that the defendant used the door panels as a hiding place to the exclusion of all other hiding places.

The defendant next submits that, even if the authorities may have harbored suspicions about the presence of contraband when they stopped his car, those suspicions were neutralized and any semblance of probable cause dispelled when the drug-sniffing dog failed to alert. We do not agree. A drug-sniffing dog's failure to alert is not invariably inimical to the existence of probable cause; instead, it is merely one fact to be weighed when assessing the totality of the circumstances. See United States v. Davis,

430 F.3d 345, 365-67 (6th Cir. 2005) (Sutton, J., concurring in part and dissenting in part) (collecting cases in support of "a near universal recognition that a drug-sniffing dog's failure to alert does not necessarily destroy probable cause").  In the case at hand, we conclude that the dog's failure to alert did not vitiate probable cause, given both the strength of the information previously gleaned from CD and the fruits of the investigation up to that point.  This conclusion becomes inescapable in light of the fact that the dog was not trained to react to prescription opiates.[2]  See id.

To say more about the vehicle search would be to paint the lily.  We hold, without serious question, that the authorities had probable cause to search the defendant's car.  Consequently, the evidence seized during the vehicle search was admissible, and the district court did not err in denying the defendant's motion to suppress the fruits of that search.

B.  **The Challenged Statements.**

This brings us to the denial of the defendant's motion to suppress his statements to the authorities.  Our review of the district court's factfinding is deferential:  "In the Miranda

---

[2] We note that the district court supportably credited testimony that, in drug-trafficking investigations, it is the standard practice of the Maine State Police to employ drug-sniffing dogs during traffic stops even though the anticipated contraband is not a substance that the dog was trained to detect.  See Simpkins, 2019 WL 148650, at *3 & n.4.

context especially, we are reluctant to disturb the district court's suppression decision, such that 'if any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial.'" United States v. Melo, 954 F.3d 334, 339 (1st Cir. 2020) (quoting United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008)).

The baseline rule is that Miranda warnings must be given before "a person [is] questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Miranda, 384 U.S. at 444). The genesis of this rule is apparent: Miranda warnings are designed "to protect against the extraordinary danger of compelled self-incrimination that is inherent in" custodial interrogations. United States v. Meléndez, 228 F.3d 19, 22 (1st Cir. 2000). Generally, statements obtained in violation of the Miranda principles are inadmissible. See United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020).

Despite their importance, Miranda rights may be waived. A suspect, having been duly advised of his Miranda rights, may forgo those rights and voluntarily submit to questioning. See id. Even then, the suspect may bring the questioning to a halt by subsequently invoking his right to remain silent. See United States v. Thongsophaporn, 503 F.3d 51, 55-56 (1st Cir. 2007).

- 14 -

Against this backdrop, we turn to the defendant's dual claims of Miranda error. We take them one by one.

**1.  The "Fentanyl" Statement.**  The defendant first challenges the district court's refusal to suppress a statement that he made before any Miranda warnings were administered. Some stage-setting is useful.

We assume arguendo — as the defendant exhorts — that he was "in custody" from the moment that the troopers ousted him from his vehicle.  On this assumption, the defendant posits that his statement about having "[j]ust a little bit of fentanyl," made prior to his receipt of Miranda warnings, should have been suppressed.  We think not.

Like many general rules, the Miranda rule admits of some exceptions.  One such exception allows the admission of unwarned custodial statements given in response to "questions necessary to secure [an officer's] own safety or the safety of the public." United States v. Fox, 393 F.3d 52, 60 (1st Cir. 2004) (alteration in original) (quoting New York v. Quarles, 467 U.S. 649, 659 (1984)), cert. granted, judgment vacated on other grounds, 545 U.S. 1125 (2005). For this exception to apply, the officers' questions must relate to an "objectively reasonable need" to address an "immediate danger" and cannot be "designed solely to elicit testimonial evidence from a suspect." Quarles, 467 U.S. at 659 & n.8.

The district court concluded that the public safety exception applied to the defendant's "fentanyl" statement. Simpkins, 2019 WL 148650, at *4. It found that, during the traffic stop, the Maine State Police "followed procedures for a high-risk arrest" because they knew from reports of an August 2017 "mental wellness check" that the defendant owned firearms and other weapons.[3] Id. at *2 & n.3. Following that high-risk protocol, the defendant was handcuffed and patted down for weapons immediately upon exiting his vehicle. See id. at *2. During the pat-down, the defendant was asked if he had "anything on" him. Id. Although he replied that he only had a pocketknife, the trooper conducting the pat-down "noticed" something in the defendant's pocket, apparently by feel, and asked, "[w]hat's that?" Id. The defendant replied that it was "[j]ust a little bit of fentanyl." Id.

On this record, it is apparent to us — as it was to the district court — that the question which elicited the defendant's "fentanyl" statement arose out of an objectively reasonable concern for officer safety rather than an effort to obtain

---

[3] Reports of that incident indicated that the defendant had discharged a firearm inside his Rhode Island home and had told the police that he was being watched by the CIA and the DEA. After the defendant was remitted for a psychological evaluation, the police removed a number of firearms and edged weapons from his residence. Those items were returned to him at some time prior to the traffic stop that is at issue here.

testimonial evidence.  See Quarles, 467 U.S. at 659 & n.8.  As the defendant conceded below, his personal history justified the precaution of a pat-down for weapons.  Though open-ended in nature, the trooper's question was posed in furtherance of a reasonable and briskly conducted check for weapons.  What is more, it followed closely on the heels of the defendant's admission that he possessed a weapon in the form of a pocketknife.  Under the public safety exception, the trooper was not required to make a split-second decision about whether to subordinate his immediate safety concerns to the admissibility of any answers he might receive to his pat-down-related questions.  We conclude, therefore, that the district court, see Simpkins, 2019 WL 148650, at *4, did not clearly err in receiving the defendant's "fentanyl" statement into evidence.[4]  See Quarles, 467 U.S. at 657-58.

**2.  Statements in the Cruiser.**  This leaves the statements made by the defendant in the police cruiser after he had received Miranda warnings.  With respect to those statements, the district court rebuffed two arguments made by the defendant in favor of suppression:  that the defendant had not effectively waived his rights and that, even if he had, he later invoked his

_____

[4] The district court noted that there was conflicting evidence as to whether the fentanyl was in a baggie or a plastic container, see Simpkins, 2019 WL 148650, at *4 n.6, but made no explicit finding in this respect.  The parties make nothing of this discrepancy on appeal, and we ascribe no importance to the question of how the fentanyl was packaged.

- 17 -

right to remain silent.  See Simpkins, 2019 WL 148650, at *4.  In this venue, the defendant renews each of these arguments.[5]

The defendant's first contention — that he never effectively waived his Miranda rights — is unconvincing.  Although he says that the trooper segued into substantive questioning without first obtaining an affirmative Miranda waiver from him, the relevant question is not whether the defendant explicitly waived his Miranda rights but, rather, whether the defendant's conduct, evaluated in light of all the attendant circumstances, evinced a knowing and voluntary waiver.  See Carpentino, 948 F.3d at 26.  To establish such knowledge, the government must show that the defendant understood "both the nature of the right being abandoned and the consequences of the decision to abandon" it.  United States v. Rang, 919 F.3d 113, 118 (1st Cir. 2019) (quoting United States v. Sweeney, 887 F.3d 529, 536 (1st Cir. 2018)), cert. denied, 140 S. Ct. 44 (2019).  And to establish voluntariness, the government must show that the defendant's waiver was the "product of a free and deliberate choice."  Id.

Miranda rights furnish important protections to those in custody, and waivers of Miranda rights are serious business.  Even

_____

[5] In his appellate briefing, the defendant also suggests that an "illegal arrest" invalidated the statements that he made while in the police cruiser.  Because no such argument was ever advanced in the district court, it is deemed waived.  See United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998).

so, a waiver of Miranda rights need not be explicit. See Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id.

So it is here. The record makes manifest that the trooper gave the defendant an adequate explanation of his Miranda rights. The defendant acknowledged that he understood these rights. And even though the defendant never explicitly affirmed that he was willing to answer the trooper's questions, we discern no clear error in the district court's conclusion that his subsequent interactions with the officer displayed such a willingness. See Simpkins, 2019 WL 148650, at *4; see also United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015) (citing Thompkins, 560 U.S. at 384) (holding that defendant "made a valid waiver by making uncoerced statements after acknowledging that he understood his Miranda rights").

Finally, we come to the defendant's last contention: that he invoked his right to remain silent during the questioning but the trooper ran roughshod over his invocation of that right. We rest this phase of our analysis on bedrock: an accused who wishes to invoke his right to remain silent must do so in an unambiguous manner. See Thompkins, 560 U.S. at 381.

Here, the defendant asserts that he unambiguously invoked his right to remain silent by telling the trooper more than once that he had "nothing to say." It is, however, common ground that "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances." United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004). This case illustrates the point. The defendant insists that his use of the phrase "nothing to say" was tantamount to stating "I don't wish to answer your questions." By contrast, the government insists that the defendant's use of the phrase "nothing to say" was simply a convenient means of denying that he possessed any guilty knowledge. The district court resolved this contretemps in the government's favor. It found that the larger context of the interview showed that each time the defendant claimed that he had "nothing to say," he was in fact "protesting his innocence, not asserting his right to remain silent." Simpkins, 2019 WL 148650, at *5.

This finding passes muster. Viewed most charitably to the defendant, both interpretations of the "nothing to say" language are plausible. And it is settled beyond hope of contradiction that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152

(1st Cir. 1990) (quoting <u>Anderson</u> v. <u>City of Bessemer City</u>, 470 U.S. 564, 574 (1985)).

We add only that, during the interview, the defendant found many ways in which to disavow any knowledge of drug-trafficking and to imply that the authorities were being misled by "bad information." Seen in this light, it was reasonable for the district court to infer that the defendant's repeated use of the "nothing to say" phrase, taken in context, was part and parcel of this pattern of disavowal.[6] The district court's determination that there was no unambiguous invocation of the defendant's right to remain silent was fully supportable and, thus, there was no barrier to continued questioning.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[6] A few examples suffice to illustrate the point. For one thing, after the trooper encouraged the defendant to "think about being honest," the defendant replied: "Sir, I have nothing to say. I didn't do anything." For another thing, when confronted with the discovery of the Suboxone strips, the defendant explained that: "I forgot all about that" and "[t]here's nothing to say." Similarly, when asked to cooperate, the defendant responded: "I have nothing to say. I'm not part of a drug conspiracy. You guys have the wrong guy."