# United States Court of Appeals
## For the First Circuit

No. 24-1534

UNITED STATES OF AMERICA,

Appellee,

v.

DINELSON HERNANDEZ-RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Montecalvo, Lipez, and Aframe, Circuit Judges.

Jonathan Shapiro, with whom Mia Teitelbaum and Shapiro & Teitelbaum LLP were on brief, for appellant.

Donald C. Lockhart, Assistant U.S. Attorney, with whom Joshua S. Levy, U.S. Attorney, was on brief, for appellee.

August 11, 2025

**LIPEZ, Circuit Judge.** Dinelson Hernandez-Rodriguez was traveling southbound on Interstate 95 when the vehicle he was driving was stopped by a Connecticut state trooper. Unbeknownst to Hernandez-Rodriguez, that vehicle was being tracked by the Drug Enforcement Administration ("DEA") as part of a months-long drug-trafficking investigation. When DEA agents searched the vehicle -- without first obtaining a warrant -- they discovered $240,240 in a hidden compartment. Hernandez-Rodriguez was subsequently charged with conspiring to distribute controlled substances in violation of 21 U.S.C. § 846 and, shortly before his scheduled trial, moved to suppress the evidence seized from the vehicle as the fruit of an illegal search. The district court denied the motion to suppress, determining that the warrantless search was permissible under the automobile exception to the Fourth Amendment's warrant requirement. Following a jury trial, Hernandez-Rodriguez was convicted of the charged drug violation and sentenced to sixty-eight months' imprisonment. He now appeals the district court's denial of his motion to suppress. We affirm.

**I.**

We briefly set forth the relevant "facts as supportably found by the district court following an evidentiary hearing" on Hernandez-Rodriguez's motion to suppress. United States v. Simpkins, 978 F.3d 1, 4 (1st Cir. 2020). "When necessary, we flesh

- 2 -

out these findings with uncontested facts drawn from the record."
Id.

In late 2019, the DEA, investigating a suspected drug-trafficking operation, focused on a Boston-based individual named Fidel Llaveria. Controlled purchases of fentanyl and court-approved Title III wiretaps led the DEA to identify Waner Baez as one of Llaveria's suspected suppliers. Subsequent surveillance revealed that Baez was an intermediary who supplied Llaveria with cocaine obtained from a New York-based supplier named Juan Carlos Espinal. Specifically, the DEA concluded that Espinal and his associates would drive large quantities of cocaine from New York to Boston via Interstate 95, delivering them to Baez's residence on Hyde Park Avenue. Once the cocaine was distributed, Espinal and his associates would return to New York with the proceeds, again via Interstate 95.

On August 6, 2020, the DEA learned through intercepted communications that Baez had received a shipment of cocaine at his Boston residence. Surveilling the residence, the DEA agents discovered two out-of-state vehicles parked nearby -- a silver Ford Explorer registered to Espinal and a white Honda Pilot registered to a third party in New York. Information obtained

from license plate readers[1] showed that the Honda Pilot had left the New York area that morning, and the Ford Explorer had traveled from New York City to Boston the day before. The DEA applied for and received warrants to affix GPS tracking devices on the vehicles.

Over the next five days, while surveilling Baez's residence and the surrounding area, DEA agents observed Espinal and another individual -- later identified as Hernandez-Rodriguez -- interacting with Baez and his associates, accessing Baez's residence, and driving both the Ford Explorer and the Honda Pilot. Simultaneously, the DEA intercepted communications indicating that Llaveria, whom agents also observed in and around Baez's residence, was communicating with potential customers regarding cocaine for sale.

On August 11, DEA agents observed the Honda Pilot pull into Baez's driveway. A short while later, Hernandez-Rodriguez was seen leaning into the driver's seat area from outside the Pilot and, after several minutes, walking away from the vehicle carrying a screwdriver. Hernandez-Rodriguez then returned and got into the Pilot, backed out of Baez's driveway, and left the area. The GPS tracker affixed to the vehicle showed it moving southbound on

---

[1] License plate readers are camera systems that capture time-stamped photos of vehicles' license plates when those vehicle pass by the cameras.

Interstate 95, eventually crossing through Rhode Island into Connecticut.

Believing that the Honda Pilot was being used to transport proceeds to New York from the distribution of the cocaine received at Baez's residence earlier that week, the DEA contacted the Connecticut State Police and asked them to conduct a "wall-off stop" of the vehicle (i.e., making it appear as though Hernandez-Rodriguez was being apprehended for a traffic violation). A DEA agent spoke directly with the Connecticut state trooper who would ultimately conduct the stop, informing him that there was reason to believe the Honda Pilot "was transporting narcotics proceeds." Using GPS coordinates provided by the DEA agent, the state trooper located and began following the Honda Pilot in a marked cruiser. Almost immediately, the Pilot left Interstate 95 via an exit ramp and took the next entrance ramp back onto the interstate -- a maneuver that, according to the DEA agent, suggested Hernandez-Rodriguez was attempting to "lose the trooper." The trooper resumed tailing the Honda Pilot once it reentered the interstate. He testified that, after about fifteen to twenty minutes, he observed the Pilot commit a lane violation. The trooper then pulled the vehicle over ostensibly for that reason.

The subsequent interaction between the trooper and Hernandez-Rodriguez, captured by the trooper's body camera, lasted

around two hours, attributable, in part, to a substantial language barrier between the individuals, with the trooper primarily speaking English and Hernandez-Rodriguez primarily speaking Spanish. Eventually pulling up a translation app on his phone, the trooper asked repeatedly where Hernandez-Rodriguez was coming from, to which Hernandez-Rodriguez responded that he was traveling from Stamford, Connecticut. The trooper found this answer improbable because Hernandez-Rodriguez had been driving toward, not away from, Stamford.

Hernandez-Rodriguez did not have his driver's license with him, and the trooper could not determine Hernandez-Rodriguez's name for some time.[2] Eventually identifying him, the trooper found that Hernandez-Rodriguez was subject to an extraditable New Jersey warrant. Hernandez-Rodriguez was told to step out of the vehicle, frisked, and placed in handcuffs.[3] While Hernandez-Rodriguez was handcuffed on the side of the interstate, the trooper searched the Honda Pilot and found approximately $3,000 in cash in the front seat.[4] Minutes later, a K-9 unit arrived and

---

[2] The district court could not determine from the body camera footage whether this difficulty was because Hernandez-Rodriguez intentionally provided false names or because of the legitimate language barrier.

[3] Hernandez-Rodriguez was not read his rights under Miranda v. Arizona, 384 U.S. 436 (1966), until he arrived at the police station several hours later.

[4] Although the government maintains that Hernandez-Rodriguez consented to this search, the district court explained that it had

inspected the vehicle, and the K-9 alerted twice to the center console. Hernandez-Rodriguez was taken to a local police station, and DEA agents searched the Honda Pilot again. Upon removing the cup holder from the center console, the agents found a hidden compartment containing $240,240 in cash.

Hernandez-Rodriguez was charged with conspiring to distribute and to possess with intent to distribute fentanyl and cocaine in violation of 21 U.S.C. § 846. Because Hernandez-Rodriguez was alleged to have been involved mainly in the cocaine side of the conspiracy, the government agreed to limit its trial proof to cocaine-related conduct. Two weeks before trial, Hernandez-Rodriguez moved to suppress the $240,240 cash seized from the Honda Pilot, arguing, inter alia, that the Fourth Amendment's warrant requirement applied because there was no probable cause to believe that the vehicle contained evidence of a crime.

Following a suppression hearing and a careful review of the record, which included several exhibits in addition to the testimony presented by two government witnesses, the district court denied Hernandez-Rodriguez's motion to suppress. Upon finding that probable cause existed, the court held that the Honda

_____

"doubts" about whether the government had met its burden to show valid consent. However, the district court determined that it did not need to decide that issue because it concluded that there was probable cause for the vehicle search.

- 7 -

Pilot was permissibly searched without a warrant under the long-established carveout to the Fourth Amendment warrant requirement known as the "automobile exception."[5] Following a seven-day trial, Hernandez-Rodriguez was convicted of conspiring to distribute cocaine and sentenced to sixty-eight months' imprisonment. This timely appeal followed.

## II.

We review the district court's denial of Hernandez-Rodriguez's motion to suppress using "a two-tiered inquiry." United States v. White, 804 F.3d 132, 136 (1st Cir. 2015). That is, "[w]e review the district court's factual findings for clear error, and we review its legal conclusions de novo." Id. "In the absence of legal error, 'we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record.'" Simpkins, 978 F.3d at 6 (quoting United States v. Arthur, 764 F.3d 92, 96 (1st Cir. 2014)).

### A. Legal Framework

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Although, pursuant to the Fourth Amendment, a law enforcement officer "ordinarily" must obtain a warrant before conducting a

___

[5] About a month after the trial concluded, the district court memorialized its oral ruling at the suppression hearing in a written order.

search, there are several exceptions to the warrant requirement. United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010). One is the "automobile exception," which permits "a warrantless search of an automobile [to] proceed so long as the authorities have probable cause to believe that contraband is within the particular vehicle." Simpkins, 978 F.3d at 6; see also Florida v. White, 526 U.S. 559, 563-64 (1999) ("[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.").

"Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'" United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (quoting Robinson v. Cook, 706 F.3d 25, 32 (1st Cir. 2013)). This "standard is satisfied when the totality of the circumstances create[s] 'a fair probability that . . . evidence of a crime will be found in a particular place.'" Id. (omission in original) (quoting United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009)). The probable cause inquiry is objective, requiring a court to consider the facts available to a law enforcement officer and not the officer's state of mind or subjective belief about whether those facts amount to probable cause. See Sanchez, 612 F.3d at 6.

To assess whether probable cause exists, "we look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual [acting] officer." United States v. Balser, 70 F.4th 613, 619 (1st Cir. 2023) (quoting United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017)). This is known as the "collective knowledge doctrine." Id. "[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to" act, we refer to that as a "vertical collective knowledge" case. Id. (alteration in original) (emphasis omitted) (quoting United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)). In such a case, "we 'impute' to the [acting] officer the directing officer's knowledge." Id. (quoting Meade, 110 F.3d at 193); see also id. at 620 (noting that "[r]eliance upon vertical collective knowledge has sparked little controversy" (alteration in original) (quoting Commonwealth v. Privette, 204 N.E.3d 967, 976 (Mass. 2023))).

**B. Analysis**

We agree with the district court that "[t]his case . . . presents a relatively straightforward example of the automobile exception to the warrant requirement," United States v. Hernandez-Rodriguez, No. 21-10298, slip op. at 5 (D. Mass. Mar. 18, 2024), involving a months-long DEA investigation into the drug distribution operation described above, which included intensive

surveillance of Baez's Hyde Park Avenue residence in the days just before the search. As the district court summarized:

> DEA agents had been investigating Llaveria, Baez, and Espinal's activities for months. The wiretap led them to believe that Espinal was transporting drugs to the Hyde Park Avenue residence and the proceeds back to New York. Hernandez-Rodriguez was seen entering and exiting the Hyde Park Avenue residence, entering and exiting the vehicles, and at the time of his stop was driving the white Honda Pilot back toward New York.

Id. at 6. Thus, "[g]iven the DEA's understanding that the conspiracy involved moving drugs from New York to Boston and proceeds of the sale of those drugs from Boston to New York, the surveillance officers' observations of Hernandez-Rodriguez interacting with his co-defendants" as well as leaning into the Honda Pilot for several minutes and emerging with a screwdriver shortly before departing from Baez's residence, and the "GPS tracking data showing the [Honda Pilot] leaving Boston in the direction of New York," we agree with the district court that "there was probable cause to believe the [Pilot] contained contraband." Id.

Under the vertical collective knowledge doctrine, we impute the DEA agents' knowledge to the Connecticut state trooper with whom the DEA communicated. See Balser, 70 F.4th at 619-20. Based on that imputed knowledge, the trooper had the requisite

- 11 -

reasonable suspicion to stop,[6] and probable cause to search, the Honda Pilot under the automobile exception.  See United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (explaining that an officer must have a reasonable suspicion of criminal activity to make an investigatory traffic stop and noting that "reasonable suspicion is . . . less than probable cause" (quoting United States v. McGregor, 650 F.3d 813, 821 (1st Cir. 2011))).  To be sure, the additional facts known to the trooper, such as the evasive driving by Hernandez-Rodriguez and the implausible insistence that he was coming from Stamford, certainly may have added to the "totality of the circumstances" that amounted to probable cause.  Silva, 742 F.3d at 7.  We agree with the government, however, that the DEA agents' imputed knowledge provided an adequate basis to search the Pilot, even absent those facts.

Resisting this seemingly inescapable conclusion, Hernandez-Rodriguez argues that the search of the Honda Pilot was improper "because it was based solely upon the 'hunch' of a DEA agent."  In support, he points out that a DEA agent who testified at the suppression hearing responded, "Sure," when asked by defense

_____

[6] In fact, the observed lane violation on its own constituted adequate grounds for the initial traffic stop of the Honda Pilot. See United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021) ("[A]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." (quoting United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011))).

- 12 -

counsel, "It's fair to say you had a hunch?" While Hernandez-Rodriguez is correct that an "'unparticularized suspicion or "hunch"' of criminal activity" alone cannot support a finding of probable cause, United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)), the extensive information known to the authorities here amounted to far more than a mere "hunch," as we have explained. Even if we were to accept Hernandez-Rodriguez's argument that the testifying agent's admission of a "hunch" amounted to a concession that she believed probable cause was wanting, that would not change the outcome here. Because "the circumstances, viewed objectively, justify" the search of the Pilot, the agent's subjective belief "is inapposite." Sanchez, 612 F.3d at 6 (quoting United States v. Hadfield, 918 F.2d 987, 993 (1st Cir. 1990)).

In sum, we conclude that law enforcement had probable cause to believe that the Honda Pilot driven by Hernandez-Rodriguez would contain evidence of drug transactions. Accordingly, under the automobile exception to the warrant requirement, the warrantless search of that vehicle did not contravene the Fourth Amendment. The district court's denial of Hernandez-Rodriguez's motion to suppress the $240,240 in cash obtained during that search is therefore affirmed.

So ordered.